POORVU CONSTRUCTION CO., INC. *vs.* NELSON ELECTRICAL COMPANY, INCORPORATED, & another.

Suffolk.    January 9, 1957. — March 11, 1957.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & CUTTER, JJ.

*Public Works. Contract,* For public works, Subcontract, Bond. *Equity Pleading and Practice,* Declaratory proceeding, Decree.

A contractor to whom was awarded the general contract for construction of a school building for a town after bidding procedure conforming to G. L. (Ter. Ed.) c. 149, §§ 44A-44C, as appearing in St. 1954, c. 645, §§ 1–3, and not including any express requirement that subcontractors furnish bonds to the general contractor had no statutory or contractual right under §§ 44A-44C or the language of (d) of the subcontractor's bid form set forth in § 44C (H) to require the furnishing

of performance and payment bonds by approved subbidders with whom he was to execute subcontracts. [546, 554]

The final decree in a suit in equity for declaratory relief should not have contained, besides a declaration adverse to the plaintiff, a provision dismissing the bill. [554]

BILL IN EQUITY, filed in the Superior Court on March 28, 1955.

The plaintiff appealed from the final decree entered after hearing by *O'Connell, J.*

*Joseph B. Abrams,* (*Robert T. Abrams* with him,) for the plaintiff & (*Jarvis Hunt,* amicus curiae, with him).

*Patrick F. Shanahan,* for the defendants (*Joseph M. Corwin,* amicus curiae, with him).

CUTTER, J. The plaintiff is a contractor who was awarded the general contract for the construction of a school building in the town of Lynnfield. Each of the defendants was named in the plaintiff's bid, under item 2 of the bid, as a subcontractor, each for a specified part of the work, and was approved as a subcontractor by the town. The bids were submitted to the town in accordance with G. L. (Ter. Ed.) c. 149, §§ 44A–44C, inclusive, as appearing in St. 1954, c. 645, §§ 1–3; § 44D, inserted by St. 1939, c. 480; and § 44E, inserted by St. 1954, c. 645, § 4.[1]

After the award of the general contract to the plaintiff and prior to the execution of the subcontracts with the defendants, respectively, the plaintiff demanded from each of the defendants a performance bond and a payment bond covering work under its subcontract. It was contended by the defendants that, under the 1954 amendments of §§ 44A–44C, inclusive, an approved subcontractor could not be required to furnish a performance bond and a payment bond to the plaintiff, even if the plaintiff paid the bond premiums. The dispute was settled, apparently so that the work would not be delayed, by the execution of a subcontract by each defendant from which had been struck out printed provisions whereby "each of the defendants [was required] at

---

[1] The provisions were again revised by St. 1956, c. 679, not here relevant.

its own expense to furnish to the plaintiff a performance and payment bond . . . equal to 100% of the subcontract price"; "in place of" such provisions each defendant stipulated with the plaintiff that a performance bond would be furnished by the subcontractor "and in the event that the court determines that the cost of said . . . bond must be borne by the general contractor that the general contractor will reimburse the subcontractor for the cost." Apparently, despite their stipulation, for reasons not apparent on this record, only one of the defendants actually furnished a performance bond on these terms.

The plaintiff brought this bill for declaratory relief as to its rights. The trial judge found the facts substantially as summarized above and entered a final decree outlining the situation and dismissing the bill and determining (a) that §§ 44A–44E (as amended by the 1954 legislation) bar the plaintiff from requiring the bonds here in issue and the insertion in the bid and subcontract documents of any requirement for such bonds, and (b) that the bond in fact given by one of the defendants should be cancelled and that this defendant should be reimbursed for the premium. The parties, in lieu of including certain testimony in the record, entered into a stipulation entitled "Agreed Statement of Facts on Appeal." This was done with the approval of the trial judge. Apart from the facts summarized in the "Agreed Statement," the trial judge also found in substance that there was no evidence of any practice or custom or usage with respect to the requiring by general contractors of performance bonds from subcontractors under the 1954 legislation, inasmuch as no practice could have developed in the brief interval between the effective date of the 1954 amendments and the signing of the contracts here in issue.

The provisions of the General Laws governing bidding on public works of the type and value here involved were inserted by St. 1939, c. 480, and were comprehensively revised by St. 1941, c. 699, and St. 1954, c. 645. This court has had occasion to consider the earlier or the 1954 forms of the pro-

visions principally[1] in three cases, *Gifford* v. *Commissioner of Public Health,* 328 Mass. 608; *East Side Construction Co. Inc.* v. *Adams,* 329 Mass. 347; *Grande & Son, Inc.* v. *School Housing Committee of North Reading,* 334 Mass. 252, in which various aspects of the general structure of the statute have been considered.

Sections 44A–44C contemplate that requests for bids will designate certain work on each project to be done by subcontractors. General contractors are required to file their bids on a form set out in § 44C (G) in two parts, "Item 1, covering all the work of the general contractor" and "Item 2, covering the work and the bid prices therefor of the subcontractors." By § 44C (B) all principal and designated minor subcontractors are required to "deliver or mail to the awarding authority record copies of all bids sent by them to the general contractor" on the bid form set forth in § 44C (H). Section 44C (B) also directs, by a provision which was new in 1954, that "Bids which are incomplete, conditional or obscure, *or which contain additions* not called for, shall be rejected" (emphasis supplied). By § 44C (C) only those subbidders who have filed their bids in this manner may be used by the general contractor in his bid. The statute and the statutory bid forms contain various provisions, not here relevant in detail, for the substitution of subbidders by subsequent arrangement (in precise conformity with the statutory procedure) between a successful general bidder and the awarding authority, but from all of these provisions it appears that the general contractor is not to be required to employ for work any subcontractor (at least if not included in his own bid for that work) against whose standing and ability the general contractor makes objection.

The bid form for general contractors found in § 44C (G) as amended in 1954 provides that he "within five days . . . after presentation thereof by the awarding authority, [will]

[1] See, for cases incidentally relevant to these statutes, *Capuano, Inc.* v. *School Building Committee of Wilbraham,* 330 Mass. 494; *M. Ahern Co.* v. *John Bowen Co. Inc.* 334 Mass. 36, 40–41.

execute the contract and furnish a performance bond and also a labor and materials or payment bond . . . each in the sum of at least fifty per cent of the contract price, the premiums for which are to be paid by the general contractor and are included in the contract price."

The provisions of § 44C (E) and the related bid form have gone through various changes in 1941 and 1954 since their original enactment in 1939, which, in major degree, give rise to the present controversy. The changes in § 44C (E) are best shown by the following excerpt from the section as amended by St. 1941, c. 699, § 4. The words in italics were added in 1941. The other words were in the original form of the section as enacted in 1939. "(E) If a sub-contractor who has been selected and included in the general contract fails to sign the sub-contract within ten days after notice of selection, *or fails to furnish a performance bond to the general contractor within ten days after notice of selection if required so to do by the general contractor or the awarding authority, by an instrument in writing mailed or delivered to such sub-contractor with, or within five days after, such notice of selection*, the awarding authority, architect and engineer, or any one or more of them, and the general contractor shall select, from the sub-bidders who have conformed to the bidding procedure, the next lowest bidder at the amount named in such sub-bid, and the total contract price shall be revised in accordance with the change in figures as submitted."

By St. 1954, c. 645, § 3, § 44C (E) was restored to its 1939 form in all substantial respects here pertinent.[1]  All ref-

---

[1] In the following quotation of the provision as it appears in the 1954 version words added in 1954 to the 1939 language are italicized. Words omitted in 1954, which appeared in the 1939 version, are shown in brackets: "(E) If a subcontractor who has been selected and included in the general contract fails to [sign] *execute* the sub-contract *document, contingent upon the final execution of the general contract*, within [ten] *five* days, *Sundays and holidays excluded*, after notice of selection, the awarding authority [architect and engineer, or any one or more of them] and the general contractor shall select, from the sub-bidders who have conformed to the bidding procedure, [the next lowest] *a responsible and eligible bidder* at the amount named in such sub-bid, and the total contract price shall be revised in accordance with the change in figures as submitted."

erences (inserted in 1941) to bonds are omitted from the 1954 version.

The changes in the relevant provisions of the subbidder's proposal form are shown in the form as amended by St. 1941, c. 699, § 7: "The undersigned further agrees to be bound to the general contractor by the terms of the general conditions, drawings and specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the owner, *and, if so required by the general contractor or the awarding authority, by an instrument in writing delivered or mailed by such contractor or authority to the undersigned, to furnish a performance bond with a surety company, authorized to transact business in the commonwealth, as surety, in the sum of twenty-five per cent of the contract sum, the premium for which bond is to be paid by the undersigned.*" The words in italics were added in 1941. The remaining language appeared in the 1939 version. By St. 1954, c. 645, § 3, the italicized words were omitted from this proposal form, which by the 1954 act[1] was placed in § 44C (H).[2]

There is no basis in the record for any conclusion that, under the 1939 form of the statute, there was any custom by which general contractors required the subcontractors to furnish performance and payment bonds.

The plaintiff contends that the obligation of the subcontractor to furnish a performance bond and a payment and materials bond is found in the language of the bid form, subsection (d), by which the subcontractor agrees "to be bound to the general contractor by the terms of the general conditions, drawings and specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the owner." The plaintiff argues that, as the general contractor must give such bonds, each in the amount of at least fifty per cent of

---

[1] See for present provisions § 44F as amended by St. 1956, c. 679, § 1.

[2] The proposal form has always required subbidders to furnish information about their experience and past work and a bank reference. The changes from time to time in the information which has been required of subbidders are not material here.

the total contract price, so also the subcontractor must give such bonds to the general contractor in at least the same percentage of the subcontract price. The defendants point to the legislative history of changes, already set out above at length, as indicating that the Legislature intended by the 1954 amendments to prohibit general contractors from requiring such bonds from subcontractors, and to force general contractors to use only subcontractors of such reliability as would afford the general contractor adequate protection without the further assurance of bonds.

The defendants gain some, but not conclusive, assistance from the history of the 1954 amendments. By Res. 1953, c. 45, certain Senate and House bills, dealing with contracts for public works, presented to the 1953 session, were referred to a special commission for investigation and study. Some of these 1953 legislative documents (for example, Senate Doc. No. 447, page 8; Senate Doc. No. 459, pages 3, 6; House Doc. No. 1665, pages 3–4, 6) contained explicit provisions requiring subcontractors to furnish bonds. Others (for example, House Doc. No. 1666) omitted such provisions. The special commission's report, found in 1954 House Doc. No. 2528, without mentioning the subject of bonds in the discussion in the report, recommended legislation (pages 16–24, especially at pages 19–20, 23) omitting all references to subcontractors' bonds. This recommended legislation was reported favorably by the committee on State Administration as 1954 House Doc. No. 2588, pages 8, 11, on March 24, 1954, without material change in this respect and formed the basis of St. 1954, c. 645. The omission of references to subcontractors' bonds would thus appear to have been the result of a deliberate and conscious choice by the special commission, thereby lending some emphasis to the omission from St. 1954, c. 645, of the language relating to bonds found in the 1941 amendments mentioned above.

These omissions must be considered against the background of the general bidding procedure already discussed. Although the awarding authority has no direct contract

with the subcontractors (see the *East Side Construction Co. Inc.* case, 329 Mass. 347, 353) the legislation recognizes a distinct public interest in the contractual relationship between the general contractor and his subcontractors and purports to regulate that relationship in various respects. From the last paragraph of § 44C (B) it is plain that each subbid, a copy of which is filed with the awarding authority, is to be available to all general bidders unless a subbidder specifically restricts its use to certain designated general bidders. As was said in the *Gifford* case (328 Mass. 608, 615), "A subbid once filed by a subcontractor must have an identical meaning for all general contractors." As already noted, § 44C (B) at the top of page 644 of St. 1954, c. 645, provides that "Bids . . . which contain additions not called for, shall be rejected." It would thus seem that subbidders cannot make bids which have different meanings for different general contractors. They also cannot include in their subbids a provision for furnishing a performance or other bond to the general contractor unless perhaps under circumstances not here presented.[1]

The former cases under §§ 44A–44C, in their pre-1954 form and as amended in 1954, have made it clear that there must be strict compliance with the statutory requirements (see the *Gifford* case, 328 Mass. 608, 616; the *East Side Construction Co. Inc.* case, 329 Mass. 347, 349–351; the *Grande & Son, Inc.* case, 334 Mass. 252, 254, 256) and, accordingly, we construe these provisions strictly. There is nothing in the present record to show that the advertise-

---

[1] We expressly do not decide, since on this record there is no necessity of doing so, whether under §§ 44A–44E as amended in 1954 (a) an awarding authority may require in its advertisement for bids that subcontractors shall furnish bonds to the general contractor or (b) a general contractor in advance of the bids and subbids (and on a basis fully disclosed therein) may make contractual arrangements with a subbidder, as a condition of including his subbid in a general bid or otherwise, for the subbidder to furnish a performance or payment bond. When and if such questions arise, it will be necessary to determine whether the considerations discussed in the *Gifford* case (328 Mass. 608, especially at page 615) apply to such arrangements or whether the arrangements are merely reasonable methods, not forbidden by the statute and consistent with the public interest, of enabling general contractors to make use of capable subcontractors, whose limited financial resources would otherwise be a deterrent to their employment. We have not considered the amendments made by St. 1956, c. 679.

ment for bids and subbids included any requirement that subcontractors furnish any bonds or that the subbids contain any explicit undertaking by the defendants as subbidders to furnish such bonds. We think, especially in view of the legislative history of the statutory provisions since 1939, that no such obligation can be implied from the general undertaking, already quoted, of successful subbidders to bind themselves to the general contractor by the terms of the general conditions, drawings and specifications, and to assume toward him all the obligations that he assumes to the owner. We find nothing in this language as it was originally enacted in 1939 which is sufficiently explicit to require the furnishing of any bonds by subcontractors. The Legislature apparently thought that the express provisions for bonds, added by St. 1941, c. 699, §§ 4, 7, to § 44C (E) and to the subbid form, were necessary to ensure that these bonds would be given at a time when it was intended that there should be such bonds. Regardless of whether this view was correct in 1941, it is hard to believe that the deliberate omission of the bond provisions in 1954 should not be construed as an intentional removal of any statutory obligation resting on subcontractors to furnish such bonds. Compare *Brockton Edison Co.* v. *Commissioner of Corporations & Taxation,* 319 Mass. 406, 410–411.

Accordingly, the subbids in the case at bar on this record must be taken to have been offers (see the *East Side Construction Co. Inc.* case, 329 Mass. 347, 350; Restatement: Contracts, § 24; Corbin, Contracts, § 24) by the defendants to enter into bilateral subcontracts with the plaintiff for the work specified in their respective subbids. The plaintiff could only accept those offers unconditionally and unchanged (a) if it was to comply with the bidding procedure (see the *Gifford* case, 328 Mass. 608, 615) and (b) if, on usual principles of contract law, the plaintiff was to obtain by such acceptance binding subcontracts with the defendants on the basis of the subbids. *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 148. *Kennedy* v. *Russell,* 280 Mass. 510, 514. Restatement: Contracts, § 59. We see nothing in facts ap-

pearing in this record which gave the plaintiff any statutory or contractual right to require any bonds from the defendants.

The general purport of the final decree is correct but it must be modified slightly in form. The bill, although meager in its statement of the facts and the controversy and in its prayers for relief, seeks only declaratory and general relief. The final decree appropriately should not have dismissed the bill where declaratory relief was in fact granted. *Foley* v. *Springfield,* 328 Mass. 59, 62–63. *Cohen* v. *Santoianni,* 330 Mass. 187, 189. *Zaltman* v. *Daris,* 331 Mass. 458, 462.[1] The final decree is reversed and a new final decree is to be entered limited to declarations (a) that the plaintiff is not on this record entitled, by virtue of the provisions of §§ 44A–44E, as amended in 1954, or of any contractual arrangement, to require the defendants, or either of them, to furnish any performance or payment bond in connection with the work in Lynnfield here involved, regardless of whether the plaintiff or the defendants, respectively, pay the premium on such bond, and (b) that the plaintiff shall pay to the defendant, Nelson Electrical Company, Incorporated, the premium of $399.90 paid by it.[2] The new final decree shall also provide that no costs in the Superior Court or in relation to this appeal shall be allowed.

*So ordered.*

---

[1] Compare cases where the bill was dismissed as a matter of discretionary denial of declaratory relief under G. L. (Ter. Ed.) c. 231A, § 3, or because declaratory relief could not be granted. See, for example, *Morgan* v. *Banas,* 331 Mass. 694, 698; *Wakefield* v. *Attorney General,* 334 Mass. 632, 635.

[2] The provision for cancellation of the bond (found in the original final decree) has been omitted since the record discloses no prayer by any party for such relief and the question of its cancellation is not presented to us.